Slip Op. 26-74

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BIO-LAB, INC., INNOVATIVE WATER CARE LLC AND OCCIDENTAL CHEMICAL CORPORATION,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant,

**JUANCHENG KANGTHAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,**

Defendant-Intervenors.

**Before: Timothy M. Reif, Judge**

**Court No. 25-00054**

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's *Final Results*.]

Dated: July 14, 2026

<u>Chase J. Dunn</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for plaintiffs Bio-Lab, Inc., Innovative Water Care LLC and Occidental Chemical Corporation. Also on the briefs was <u>James R. Cannon, Jr</u>.

<u>Tate N. Walker</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. Of counsel was <u>Charlie Chung</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Alexandra H. Salzman</u>, The Inter-Global Trade Law Group PLLC, of Washington, D.C., argued for defendant-intervenors Juancheng Kangtai Chemical Co., Ltd. and Heze Huayi Chemical Co., Ltd. Also on the brief were <u>Gregory S. Menegaz</u> and <u>Vivien Jinghui Wang</u>.

\*        \*        \*

Reif, Judge:  This action concerns the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping ("AD") order on chlorinated isocyanurates ("chlorinated isos," or "subject merchandise") from the People's Republic of China ("China") for the period of review ("POR") June 1, 2022, through May 31, 2023.  *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023* ("*Final Results*"), 90 Fed. Reg. 9,710 (Dep't of Commerce Feb. 18, 2025) and accompanying Issues and Decision Memorandum ("IDM") (Dep't of Commerce Feb. 7, 2025); *see also Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023* ("*Preliminary Results*"), 89 Fed. Reg. 56,303 (Dep't of Commerce July 9, 2024) and accompanying Preliminary Decision Memorandum ("PDM") (Dep't of Commerce June 28, 2024).

Bio-Lab, Inc., Innovative Water Care LLC and Occidental Chemical Corporation (collectively "petitioners," or "plaintiffs") challenge certain aspects of the *Final Results* in a motion for judgment on the agency record with respect to Commerce's decision not to select Mexico as the primary surrogate country for purposes of calculating normal value. Specifically, plaintiffs request that the court remand to Commerce for reconsideration: (1) Commerce's determination that Mexico was not at the same level of economic development as China during the POR; (2) the question of whether chlorinated isos are "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1; and (3) Commerce's determination that calcium hypochlorite ("calcium hypo") and sodium hypochlorite  ("sodium hypo") are comparable merchandise to chlorinated isos for

purposes of surrogate country selection.  Mem. Law and Fact in Supp. Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Pls. Br.") at 4, ECF No. 23.

For the reasons discussed below, the court sustains in part and remands in part the *Final Results*.

## BACKGROUND

On August 3, 2023, Commerce initiated the administrative review at issue here. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 51,271 (Dep't of Commerce Aug. 3, 2023).

On October 12, 2023, Commerce placed the Surrogate Country ("SC") List on the record.  Commerce Mem., "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (Oct. 12, 2023), attach. 1, PR 29. The SC List contained the following countries: Bulgaria, Chile, Costa Rica, Malaysia, Romania and Türkiye.  *Id.*

On July 9, 2024, Commerce issued the *Preliminary Results*.  *See Preliminary Results*, 89 Fed. Reg. 56,303.  Commerce selected Romania as the primary surrogate country.  PDM at 19.

On February 18, 2025, Commerce issued the *Final Results*.  *See Final Results*, 90 Fed. Reg. 9,710.  Commerce continued to select Romania as the primary surrogate country.  IDM at 5-11.

On March 4, 2025, plaintiffs filed a summons and complaint in the instant action. Summons, ECF No. 1; Compl., ECF No. 7.

On July 14, 2025, plaintiffs moved for judgment on the agency record.  Pls. Br.

On May 27, 2026, the Court heard oral argument.  Oral Arg., ECF No. 39.

**JURISDICTION AND STANDARD OF REVIEW**

28 U.S.C. § 1581(c) grants to this Court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."  Section 516A of the Tariff Act of 1930 provides that in an action under 19 U.S.C. § 1516a(a)(2), the court will hold unlawful any determination, finding or conclusion that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[1]  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Even so, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United*

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

*States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

"[T]he Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom.*, *Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

**DISCUSSION**

**I.     Legal framework**

19 U.S.C. § 1677b(c)(1) provides that Commerce "shall determine the normal value of the subject merchandise" in an AD investigation that involves a non-market economy ("NME") country "on the basis of the value of the factors of production [("FOPs")] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  *See Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *2 (CIT Aug. 21, 2015).

In administrative proceedings that involve an NME country such as China, Commerce calculates the "normal value" of the subject merchandise by selecting surrogate data from one or several market economy countries that Commerce determines constitute the "best available information" in the record.  19 U.S.C. § 1677b(c)(1); *Heze Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1309-10 (2021).

The "best available information" standard involves "a comparison of the competing data sources" in the record. *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019). Section 1677b(c)(1) does not define "best available information," which means that Commerce has "broad discretion" to evaluate information in the record. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

When reviewing a determination by Commerce, the "court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Id.* (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

Commerce, "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production" in a surrogate country that is "at a level of economic development comparable" to that of the NME, and a "significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4). And "[t]o the extent possible, Commerce's regulatory preference is to 'value all factors in a single surrogate country.'" *Jinko Solar Imp. and Exp. Co. v. United States*, 48 CIT __, __, 701 F. Supp. 3d 1367, 1381 (2024) (quoting 19 C.F.R. § 351.408(c)(2)).

## II. Commerce's determination that Mexico was not at the same level of economic development as China during the POR

The court concludes that Commerce explained adequately its determination that Mexico was not at the same level of economic development as China during the POR.

On October 12, 2023, Commerce placed the SC List on the record and solicited comments regarding surrogate country selection and surrogate value data. PDM at 2.

Commerce identified Bulgaria, Chile, Costa Rica, Malaysia, Romania and Türkiye as countries "at the same level of economic development as China based on the per capita GNI data from the World Bank's *World Development Report*." *Id.* at 7; *see also* SC List.

Commerce explained that "[i]t is Commerce's practice to update the SC List once per year, typically after the World Bank GNI per capita data is [sic] updated, which is usually in July." PDM at 12. In the instant case, Commerce prepared the SC List in August 2023 using the most recent *World Development Report*, which was released on July 1, 2023, and was based on 2022 GNI data. *See* SC List.

On December 18, 2023, the World Bank issued a partial update of GNI data for some of the countries in the *World Development Report*. *See* Letter from Pet'rs, "Rebuttal Comments on Surrogate Values" (Jan. 2, 2024) at 3, PR 65-66; *id.*, attach. 1.

On January 2, 2024, petitioners submitted the partially updated data and argued that "[t]he data demonstrate that Mexico's GNI has increased to US$10,820, making it more comparable to China ($12,850) than Turkey ($10,640), a country currently on Commerce's list of potential surrogates." *Id.* at 3.

In the *Preliminary Results*, Commerce noted that "[f]rom the information submitted by the petitioner, it appears that, as of December 2023, the World Bank has updated the data for some, but not all, of the countries." PDM at 13; *see also* IDM at 8. Commerce noted specifically that "the data for Chile and China do not appear to have yet been updated." PDM at 13.

Commerce set aside the data from the December 2023 update and explained that "[u]pdating the SC List at intervals when some, but not all, of the data have been

updated could result in arbitrary changes to the list that would be reversed once data for all of the countries is [sic] updated." *Id.*

As a result, Commerce declined to add Mexico to the SC List and determined that Mexico was not at the same level of economic development as China during the POR. IDM at 7.

Plaintiffs object that the July 2023 *World Development Report* is merely a "snapshot of that database at a particular point in time" and should not be afforded greater weight than the December 2023 update. Pls.' Reply Br. at 4-11 ("Pls. Reply Br."), ECF No. 29. This objection is unavailing.

In discussing mid-year changes in GNI data, Commerce stated the following:

> Commerce relies on the annual release of the *World Development Report* as the triggering event for Commerce's reconsideration of potential surrogate countries. Commerce examines the new *per capita* GNI data for the NME country and the change in *per capita* GNI from the year before, and compares the change in the NME country's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of SCs. Next, we determine whether it is necessary to re-center the GNI range in light of the year-to-year GNI changes. Given various changes in GNI among countries, it is generally the case that the GNI range relied on in the previous year may need to be reset or re-centered.[2]

IDM at 8.

Commerce's selection of a "triggering event" from which to draw GNI data is within the agency's "discretion to develop a reasonable methodology to implement its surrogate country selection criteria." *Jacobi Carbons AB v. United States*, 41 CIT __,

---

[2] Plaintiffs do not claim that the December 2023 update included new GNI data for China, the center for the SC List in this case. *See* Pls. Br.; Pls. Reply Br.

__, 222 F. Supp. 3d 1159, 1175 (2017); *Bio-Lab, Inc., v. United States*, 49 CIT at __, 776 F. Supp. 3d 1315, 1328-31.

"When Congress does not mandate a procedure or methodology for applying a statutory test, 'Commerce may perform its duties in the way it believes most suitable.'" *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1298 (Fed. Cir. 2016) (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015)). In the absence of a clear statutory command, Commerce has determined that it is "reasonable to not rely on intermittent and partial World Bank updates because they are not comprehensive and do not reflect how all other countries, besides Mexico, may have shifted on an annual basis in their economic development." IDM at 8.

Commerce's approach is reasonable and its explanation clear. Even if the GNI data *are* updated on a rolling basis throughout the year, it is suitable to follow the annual release timeline of the World Bank, the organization that prepares the GNI data upon which Commerce relied. *See, e.g., Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 7,270 (Dep't of Commerce Feb. 7, 2020) and accompanying PDM at 10 (Dep't of Commerce Jan. 31, 2020) ("Consistent with its practice, and section 773(c)(4)(A) of the Act, Commerce identified Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey as countries at the same level of economic development as China based on the most current *annual issue* of the *World Development Report* (emphasis supplied)); *see also Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative*

*Review; 2022-2023*, 89 Fed. Reg. 35,797 (Dep't of Commerce May 2, 2024) and accompanying PDM at 11 (Dep't of Commerce Apr. 26, 2024).

Notably, plaintiffs have not suggested an alternative "triggering event" for Commerce to apply in all proceedings, nor do plaintiffs attack explicitly the rationale of designating the annual release of the *World Development Report* as the triggering event. *See* Pls. Br.; Pls. Reply Br. And in explaining its rationale in the *Final Results*, Commerce met its obligation to consider petitioners' submission of the December 2023 Mexican GNI data and corresponding arguments. *See* IDM at 7-8; *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Commerce . . . has an 'obligation' to address important factors raised by comments from petitioners and respondents.").

For these reasons, Commerce explained adequately its determination that Mexico was not at the same level of economic development as China during the POR. The court sustains on this point.

III.   **Commerce's determination that Romania was a significant producer of comparable merchandise during the POR**

A.     **Whether chlorinated isos are "unusual or unique" merchandise**

The court concludes that Commerce failed to consider whether chlorinated isos are "unusual or unique" merchandise under Policy Bulletin 04.1.

This Court has recognized that the "sequential approach" to surrogate country selection set forth in Policy Bulletin 04.1 is "consistent with the 'best reading' of the statute." *Bio-Lab*, 49 CIT at __, 776 F. Supp. 3d at 1330-31 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)).

Under this approach, Commerce treats economic comparability as a "threshold criterion." *Id.* at __, 776 F. Supp. 3d at 1330. Specifically,

> Commerce's sequential approach gives the first factor, economic comparability, a gate-keeping function not afforded to the second factor. Commerce will in most cases exclude from consideration a country that is not on the list of potential surrogate countries even if that country is a significant producer of highly comparable, even identical, merchandise pursuant to the second factor.

*Id.*

However, in certain circumstances, Commerce provides a full exception to its default treatment of economic comparability as a threshold criterion. *Id.* at 1331. Commerce contemplated and provided expressly for situations in which the second factor should function instead as the threshold when screening potential surrogate countries:

> Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries.

Import Admin, U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) ("Policy Bulletin 04.1").

Plaintiffs contend that they "argued early and often that Chlor isos constitute 'unusual or unique merchandise'" but "Commerce failed to address these arguments in the *Preliminary Results* and *Final Results*." Pls. Br. at 20-21 (citing PDM at 9; IDM at cmt. 1).

Indeed, petitioners raised this argument at every stage of the proceeding. *See* Letter from Pet'rs, "Comments on Surrogate Country List" (Oct. 19, 2023) at 5 ("Given

the unique nature of chlor isos . . . Commerce should 'first ensure . . . that the significant producer of comparable merchandise requirement is met.'" (second alteration in original)), PR 32; Letter from Pet'rs, "Pet'rs' Comments on Primary Surrogate Country Selection" ("Pet'rs Primary SC Selection Cmts.") (Dec. 6, 2023) at 5 (arguing that "chlor isos should be considered unique or unusual products within the meaning of Policy Bulletin 04.1"), CR 36-38; Letter from Pet'rs, "Petrs' Case Brief" (Nov. 1, 2024) at 9-10, PR 119.

Commerce noted the argument of petitioners in the *Preliminary Results* but did not address it directly. *See* PDM at 9-10. And Commerce did not even acknowledge the argument in the *Final Results*. *See* IDM. Neither defendant nor defendant-intervenors dispute this fact. *See* Def.'s Corrected Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def. Br.") at 32-34, ECF No. 26; *see also* Corrected Def.-Intervenors' Resp. Br. at 5-8, ECF No. 28.

Commerce is not required to "address every argument and piece of evidence" before it. *See Husteel Co. v. United States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1359 (2015) (citing *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001)); *see also Chemours Co. FC, LLC v. United States*, 45 CIT __, __, 492 F. Supp. 3d 1333, 1337 (2021). However, "Commerce . . . has an 'obligation' to address important factors raised by comments from petitioners and respondents." *SKF USA*, 630 F.3d at 1374.

An argument that, if successful, would "provide[] a full exception" to Commerce's standard surrogate selection methodology is certainly important enough to generate an obligation for Commerce. *Bio-Lab*, 49 CIT at __, 776 F. Supp. 3d at 1331.

Defendant claims that Commerce in effect addressed plaintiffs' argument when it considered whether CYA is a "specialized or dedicated" input in the production of chlorinated isos. Def. Br. at 33-34 (citing IDM at 9-10). But this argument is unavailing.

First, the "specialized or dedicated" input inquiry is entirely separate from the "unique or unusual merchandise" inquiry. The former considers an *input*, here CYA, used in the production of the subject merchandise. *See* Policy Bulletin 04.1. The latter considers the qualities of one or more inputs "or other unique aspects of the cost of production" in the analysis of a particular item of merchandise. *Id.* At best, the "specialized or dedicated" input inquiry would overlap as to one of the inputs involved in the "unique or unusual merchandise" inquiry, but they are not perfect substitutes.

Second, it is erroneous to conflate the terms "specialized or dedicated" and "unusual or unique" without some indication that Commerce meant to do so in the Policy Bulletin. *Cf. Bank of N.Y. v. FDIC*, 453 F. Supp. 2d 82, 93 (D.C. Cir. 2006) ("When different terms are used in a single piece of legislation, a court must presume that Congress intended the terms to have different meanings." (quotation modified) (quoting *Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986)); *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022). Commerce does not proffer any such indication in the *Final Results*. *See* IDM; *see also* PDM.

Third, Commerce does not draw any comparison between the two inquiries in the *Final Results*. *See* IDM at 9-11. Defendants' attempt to do so now is a post-hoc rationalization that cannot support the determination of Commerce with substantial evidence. *See Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 46 CIT __, __, 578 F. Supp. 3d 1310, 1320 (2022) ("A court will uphold an agency action when the

explanation is of less-than-ideal clarity; however, the explanation must come from the agency, not counsel's *post hoc* rationalization of agency action.").

For these reasons, the court remands to Commerce to address expressly whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1.

### B.      Whether calcium hypo and sodium hypo are comparable to chlorinated isos

Plaintiffs argue that Commerce's determination that calcium hypo and sodium hypo are comparable to chlorinated isos is not supported by substantial evidence. Pls. Br. at 22-30.

The statute requires that Commerce, "to the extent possible," select a surrogate country that is a "significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4). At the second step of Commerce's sequential approach, "the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on [the surrogate country] list." Policy Bulletin 04.1. Policy Bulletin 4.1 notes that "'comparable merchandise' is not defined in the statute or the regulations, since it is best determined on a case-by-case basis." *Id.* For that reason, the determination of comparability "depends on the subject merchandise" itself. *Id.*

"To determine if a product produced by a company in the surrogate country is comparable, Commerce's established practice is to apply a three-part test that examines 'physical characteristics, end uses, and production processes.'" *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 490, 318 F. Supp. 2d 1339, 1348 (2004) (quoting *Certain Cased Pencils from the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed.

Reg. 48,612 (Dep't of Commerce July 25, 2002) and accompanying IDM at cmt. 5

(Dep't of Commerce July 16, 2002)); *US Magnesium LLC v. United States*, 39 CIT __,

__, 72 F. Supp. 3d 1341, 1357 n.25 (2015); *List Indus., Inc. v. United States*, 47 CIT __,

__, 641 F. Supp. 3d 1400, 1406 (2023).

In the *Final Results*, Commerce determined that calcium hypo, sodium hypo and

chlorinated isos are similar along all three factors.  *See* IDM at 9-11.  Plaintiffs object

specifically to Commerce's determinations as to physical characteristics and production

processes.  *See* Pls. Br. at 22-30.  The court will address each set of objections in turn.

## 1.    Physical characteristics

The court concludes for two reasons that Commerce did not explain adequately

its determination that calcium hypo, sodium hypo and chlorinated isos have comparable

physical characteristics.

The first reason is that Commerce failed to explain adequately its determination

that chlorinated isos are "industrial commodity chemicals," rather than merchandise with

a "major input[]."  Policy Bulletin 04.1.

Chlorinated isos are composed of CYA, chlorine and caustic soda.  *See* Pet'rs

Primary SC Selection Cmts. at 6.  Chlorine, which is common to chlorinated isos,

calcium and sodium hypo, provides the disinfecting function that purifies water in a

variety of contexts.  *See, e.g.*, Letter from Respondents, "Rebuttal Comments on GNI

List" (Oct. 23, 2023) ("Respondents Rebuttal Cmts."), attach. 3, PR 33.  CYA is an

"intermediate chemical product . . . which is then reacted with chlorine and caustic soda

to produce chlorinated isos."  Letter from Pet'rs, "Comments Concerning the Preliminary

Determination" (May 29, 2024), Ex. D at 17, CR 65.  CYA operates as a stabilizer and is not present in sodium or calcium hypo.  *See* Respondents Rebuttal Cmts., attach. 3.

In the *Final Results*, Commerce rejected petitioners' argument in this and the prior review that Commerce should "narrowly define comparable merchandise based solely on the use of [CYA] as a 'specialized or dedicated' major input in the production of chlorinated isos."  IDM at 9; *see also* PDM at 14.

Commerce explained that "CYA does not meet the definition of a major input as described in Policy Bulletin 04.1, which generally involves 'processed, agricultural, aquatic, and mineral products,' that would warrant a narrow definition of comparable product."  IDM at 9.

Commerce contrasted these "major input" products with "'industrial commodity chemicals' . . . one of the category [sic] of products where 'the large number, and generic nature, of the inputs makes input matching very complicated.'"  *Id.* at 9-10 (quoting Policy Bulletin 04.1).

In Policy Bulletin 04.1, Commerce recognized that "[i]n the case of industrial commodity chemicals . . . it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise."  This approach accounts for the fact that for industrial commodity chemicals, "the large number, and generic nature, of the inputs makes input matching very complicated." *Id.*

Here, Commerce failed to explain how chlorinated isos belong to the category of "industrial commodity chemicals."  Chlorinated isos consist of only three intermediate inputs: CYA, chlorine and caustic soda.  Pet'rs Primary SC Selection Cmts. at 6.  Policy

Bulletin 04.1 does not define what a "large number" of inputs would be, but it seems unlikely given common usage of the term "large number" that three inputs would suffice.  *See* Policy Bulletin 04.1.

For that reason, Commerce was required to explain the reason that, in the absence of a "large number" of inputs, "input matching" would nonetheless be "very complicated" in the case of chlorinated isos such that they fall within the category of "industrial commodity chemicals."  *Id.*

Moreover, Commerce suggests that CYA is not a major input because it is not a "processed agricultural, aquatic [or] mineral product."  IDM at 9.  But Commerce's definition of "major inputs" in Policy Bulletin 04.1 does not limit the category to "agricultural, aquatic and mineral products" exclusively.  Rather, Commerce's use of "*e.g.*" suggests that the list is illustrative and not exhaustive.[3]  *See* Policy Bulletin 04.1. ("In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products . . . . ").  Commerce was required to explain the reason that CYA does not constitute a major input even if the record indicates that it is "specialized or dedicated or used intensively[] in the production of" chlorinated isos.  *Id.*

---

[3] *E.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/e.g. (last visited July 6, 2026) (defining "e.g." as "for example"); *e.g.*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/eg (last visited July 6, 2026) (defining "e.g." as an "abbreviation for exempli gratia: a Latin phrase that means 'for example'").

The second reason that Commerce did not explain adequately its determination that calcium hypo, sodium hypo and chlorinated isos have comparable physical characteristics is that Commerce did not discuss the physical characteristics of calcium hypo, sodium hypo and chlorinated isos in sufficient detail.

In the *Final Results*, Commerce stated that "the record for this review contains no new evidence to show that calcium and sodium hypochlorites are not comparable in terms of physical characteristics . . . with subject merchandise." IDM at 10. Commerce cited to the PDM, which incorporated Commerce's physical characteristics determination in the prior administrative review. *See* PDM at 13-14 ("No new information was presented by the petitioners in the instant review to alter our prior determination.").

Accordingly, the court will read the *Final Results* as incorporating the prior review determination as well.

In *Bio-Lab*, this Court concluded that Commerce's physical characteristics determination in the prior administrative review was not supported by substantial evidence. *Bio-Lab*, 49 CIT at __, 776 F. Supp. 3d at 1336. Specifically, the Court reasoned that "Commerce's explanation [was] inadequate [because] Commerce did not consider the physical characteristics of calcium hypo. . . . Commerce discussed only the physical characteristics of sodium hypo despite Commerce's conclusion that both calcium and sodium hypo are comparable to chlorinated isos." *Id.*

Because Commerce has chosen to incorporate its determination from a prior review without any substantive additions, *see* IDM at 9-11, its determination in the *Final Results* will stand or fall on the strength of the determination in the prior review.

Accordingly, the court concludes that Commerce's discussion of the purportedly shared physical characteristics among calcium hypo, sodium hypo and chlorinated isos is not supported by substantial evidence. The court remands for further explanation or reconsideration.

On remand, Commerce is instructed to explain whether: (1) CYA is a major input under Policy Bulletin 04.1; and (2) calcium hypo shares similar physical characteristics with chlorinated isos.

### 2.      Production processes

The court concludes that Commerce did not explain adequately its determination that calcium hypo, sodium hypo and chlorinated isos involve similar production processes. *See* IDM at 10.

Plaintiffs argue that Commerce "failed to address record evidence demonstrating that Chlor isos require a significantly more complex and expensive production process than calcium or sodium hypo." Pls. Br. at 25.

As with the physical characteristics inquiry, Commerce in the *Final Results* merely cited its conclusion in the prior review that there were "certain similarities in the production process[es]" of calcium hypo, sodium hypo and chlorinated isos. IDM at 10. Commerce did not accompany this citation with analyses of record evidence or any consideration of petitioners' arguments. *See id.* And, as with the physical characteristics determination, the court will read the *Final Results* as incorporating the production processes determination in the prior administrative review. *See supra* Section III.B.1.

In *Bio-Lab*, the Court concluded that Commerce's determination as to production processes was not supported by substantial evidence for two reasons:

> First, Commerce failed to support its assertion that sodium hypo and chlorinated isos both require "electrolysis, evaporation, and chlorine absorption" in their respective production processes.

> Second, Commerce failed even to apply to calcium hypo Commerce's insufficient production process analysis of sodium hypo. *. . .* This failure is significant because Commerce's determination states that both sodium *and* calcium hypo "share similar physical characteristics and end uses, *and a similar production process*, as the subject merchandise."

*Bio-Lab*, 49 CIT at __, 776 F. Supp. 3d at 1338 (citing *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024) and accompanying IDM at 6, 8 (Dep't of Commerce Dec. 28, 2023)).

For the same reasons, the court concludes that the production process determination in the *Final Results* is not supported by substantial evidence.

On remand, Commerce is directed to explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypo and calcium hypo. The production processes need not be identical, but Commerce must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs.

Commerce need not show that calcium and sodium hypo are comparable to chlorinated isos "along all three fronts," but Commerce must explain further, including based on information in the record, or reconsider its determination as to physical characteristics and production processes. *See Yantai Xinke Steel Structure Co. v. United States*, Slip Op. 14-38, 2014 WL 1387529, at *19 (CIT Apr. 9, 2014) ("Though

Commerce's practice is to consider a product's end use, physical characteristics, and production process in determining comparability, it is not restricted to using products that are comparable along all three fronts . . . ."); *see also Shanghai Foreign Trade Enters.*, 28 CIT at 491, 318 F. Supp. 2d at 1348 ("In some past cases in which Commerce has applied its three-part 'comparable merchandise' test to two classes of products made using similar materials and production processes, it has found comparability despite differences in shape, size and end use.").

## CONCLUSION

For the reasons discussed above, the court sustains in part and remands in part the *Final Results*.  Accordingly, it is hereby

**ORDERED** that on remand Commerce shall address expressly whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1; it is further

**ORDERED** that on remand Commerce shall explain whether: (1) CYA is a major input under Policy Bulletin 04.1; and (2) calcium hypo shares similar physical characteristics with chlorinated isos; it is further

**ORDERED** that on remand Commerce shall explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypo and calcium hypo; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant and defendant-intervenors shall have 21 days from the date of filing of the last comment to submit a response.

**SO ORDERED.**

/s/    Timothy M. Reif
Timothy M. Reif, Judge

Dated: __July 14, 2026__
       New York, New York